**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| ROBERT E. HURLEY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:12-CV-103-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Robert E. Hurley

on March 12, 2012, an Amended Complaint [DE 31], filed on November 26, 2013, and a Plaintiff's

Brief in Support of his Motion to Reverse the Decision of the Commissioner of Social Security [DE

15], filed by Mr. Hurley on July 25, 2012. Mr. Hurley requests that the November 9, 2010 decision

of the Administrative Law Judge denying his claims for disability insurance benefits ("DIB") and

supplemental security income ("SSI") be reversed or remanded for further proceedings. On October

31, 2012, the Commissioner filed a response, and Mr. Hurley filed a reply on November 20, 2012.

For the following reasons, the Court grants Mr. Hurley's request for remand.

## PROCEDURAL BACKGROUND

On February 28, 2009, Mr. Hurley filed applications for DIB and SSI, alleging an onset date

of September 1, 2001. The applications were denied initially on May 28, 2009, and upon

reconsideration on July 21, 2009. Mr. Hurley timely requested a hearing, which was held on August

26, 2010, before Administrative Law Judge ("ALJ") Sherry D. Thompson. In appearance were Mr.

Hurley, his attorney Allan Mindel, and vocational expert ("VE") Grace Gianforte. The ALJ issued

a written decision denying benefits on November 9, 2010. She made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since September 1, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative joint disease [sic] the right knee, obesity, hypertension, diabetes mellitus, degenerative disc disease of the lumbar spine back and back surgery (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with an ability to lift and carry 10 pounds frequently and 10 pounds occasionally; sit for 6 hours, stand/walk for 2 hours except the claimant should have a sit stand option within every hour and stand for 5 or 10 minutes on task. He can occasionally climb ramps/stairs and should never climb ladder[s], rope[s]/scaffolds. He can occasionally balance, stoop, kneel, crouch and crawl. The claimant can frequently use both upper extremities for manipulative activities.

5.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

6.    The claimant was born [in 1962] and was 39 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 FR 404.1564 and 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 405, 1569(a), 416.969, and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2001, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 12-17).

On January 20, 2012, the Appeals Council denied Mr. Hurley's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On March 12, 2012, Mr. Hurley filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision. On November 26, 2013, Mr. Hurley filed an Amended Complaint to limit the time period at issue in this appeal from September 1, 2001, to February 17, 2012, in light of the favorable decision on his subsequent application for benefits that found Mr. Hurley disabled as of February 18, 2012.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Background

Mr. Hurley was born in 1962 and was 48 years old on the date that the ALJ issued her decision.

Mr. Hurley presented with back pain after injuring his back when stepping off a ladder while working in 2001. A 2001 MRI of his lumbar spine revealed focal protrusion of the L4-L5 disc that effaced the ventral aspect of the thecal sac. The signal intensity of discs at L4-L5 and L5-S1 was decreased on the T2 weighted images. Disc bulging occurred at the lower three levels. A defect was

noted in the left lamina of L5. Doctors diagnosed Mr. Hurley with degenerative disc disease with desiccation at L4-L5 and L5-S1, circumferential degenerative disc bulging at the lower three lumbar discs, focal central disc herniation at the L4-L5 disc, a bone island in the L4 vertebral body, a laminectomy defect at L5 (from the laminectomy and discectomy in 1999), minor multilevel spondylosis, and a Schmorl's node at T12.

On October 9, 2004, Mr. Hurley gave the following history of his back pain to Holly Carobene, M.D. Mr. Hurley had an L4-L5 laminectomy and discectomy in 1999 by Dr. Gettleman. In 2001, Dr. Ghanayem performed another lumbar spine surgery at the L4-L5 level. Mr. Hurley attempted physical therapy, rehabilitation, and lumbar epidural steroid inctions three years earlier to control his back pain with no benefit. Mr. Hurley reported sharp, throbbing, and burning pain and noted that standing and walking increased his pain and that lying down decreased his pain. Mr. Hurley rated his pain as ranging from a 4 to an 8 on a 10-point scale. On examination, Mr. Hurley was cooperative and polite. His straight leg raise was positive on the left for low back and leg pain. He was tender in the midline at L5-S1. He had very limited rotation but full flexion and extension of the lumbar spine. He had increased muscle tone in the paravertebral musculature of the lumbar spine. He had 5/5 ankle flexor, quadriceps, and hamstring strength bilaterally. Mr. Hurley ambulated without assistance. The impression was lumbar radiculopathy.

On May 1, 2009, Dr. Teofilo Bautista performed a consultative examination of Mr. Hurley. Mr. Hurley reported that he had returned to work in 2002 with a twenty-pound lift limitation. At the examination, Mr. Hurley complained of numbness at the outside of the thighs to the toes, which was continuous, as was his back pain. He rated his pain at a 7 or 8 on a scale of 10. He was taking 2 to 3 Aleve tablets a day, and one aspirin daily, with limited effect on his pain. Mr. Hurley reported that

he could sit for one hour, stand for 20 minutes, and lift 20 pounds to the thigh level. He drives short distances only. He reported doing no household chores, but stated that he was independent with activities of daily living at his own pace. On examination, Mr. Hurley was unable to do range of motion of the back due to low back pain. He was also unable to do range of motion of either hip due to back pain. Mr. Hurley had a normal gait with no limping and no antalgic gain; he used no assistive devices. He was able to tandem gait slowly but was unable to do heel and toe walking due to complaints of low back pain. The neurological exam showed muscle tone and strength of 5/5 in both upper and lower extremities but numbness and tingling sensation involving both thighs, lateral aspect, and numbness in both feet. Mr. Hurley had good grip strength in both hands. Dr. Bautista's impressions were chronic low back pain (history of two surgeries, degenerative disc disease of the lumbosacral spine, disc herniation at L4-L5 and multilevel spondylosis); right knee pain due to degenerative joint disease (status post two arthroscopic surgeries in the 1990s); hypertension and hyperlipidemia; morbid obesity; and diabetes mellitus with peripheral neuropathy.

On November 11, 2009, Mr. Hurley reported that the pain interfered with his sleep. By 2009, the pain was constant, as was numbness that ranged from his thighs to his toes.

Mr. Hurley further suffered from degenerative joint disease of the right knee. Mr. Hurley underwent arthroscopic knee surgeries in the 1990s. His knee pain returned by 2007. On October 29, 2007, Mr. Hurley visited Daniel T. Weber, M.D. for an evaluation of pain involving both of his knees for some time. Dr. Weber found that the knees were stable and Mr. Hurley's motion was good but that there was pain with patellar compression and some crepitance present. X-rays of the knees were unremarkable other than some mild patellofemoral arthritic changes and some mild lateral

changes. Dr. Weber opined that the knee problem predominantly had to do with the patellofemoral articulation, and he prescribed a course of therapy.

On August 15, 2008, Michael C. Leland, M.D. examined Mr. Hurley, noting that Mr. Hurley reported popping and giving way and aching pain in his right knee for years and that his efforts to lose weight have made his knees worse. On examination, Dr. Leland felt a snap at the lateral aspect of the joint, Mr. Hurley's patella was laterally subluxed, and there was pain and crepitation at the patellofemoral joint with range of motion. The x-ray showed moderate joint space narrowing of all compartments of the right knee. Dr. Leland's impression was internal derangement of the right knee as well as early osteoarthritis.

On October 1, 2008, Mr. Hurley underwent excision of the lateral meniscus, excision of the remnant of the medial meniscus, and debridement with excision of osteophytes. In his pre-surgery report, Dr. Leland opined that there was an element of "mechanical internal derangement" of the right knee as well as degenerative arthritis based on the MRI. In the preliminary report following surgery, the postoperative diagnosis was torn right lateral meniscus and retained residual portion of medial meniscus and osteoarthritis. On October 13, 2008, Mr. Hurley reported no locking or popping.

Mr. Hurley returned to Dr. Leland on January 29, 2009, complaining of recurrence of pain in the right knee that Dr. Leland described as "pretty arthritic in character." (AR 407). As a result, Dr. Leland administered a series of three pain injections. On July 15, 2009, an x-ray was taken of the right knee for the disability determination because of Mr. Hurley's complaint of knee pain, revealing mild degenerative changes of the right knee and mild narrowing of the medial joint space.

At the May 1, 2009 consultative evaluation with Dr. Bautista, Mr. Hurley complained that his right knee gives out all the time and that he had had a steroid injection in his left knee without pain improvement. Upon examination, Mr Hurley had bilateral knee flexion of 90 degrees, right knee with pain and tenderness in the anterior knee and the left knee without pain or tenderness. Mr. Hurley had good bilateral knee reflexes with the right knee with mild swelling compared to the left knee.

In addition, Mr. Hurley complained of right shoulder pain in 2007. Dr. Daniel Weber, M.D., examined and diagnosed him with lateral epicondylitis. He complained of elbow pain as well.

Mr. Hurley suffered from diabetes mellitus, diagnosed when he was 35 years-old. His diabetes was poorly controlled and he experienced diabetic neuropathy. He was obese, weighing as much as 378 pounds at 6 feet tall and suffered from hypertension.

In 2009, Mr. Hurley was diagnosed with hematuria after finding blood in his urine. His prescription medications included Diovan, Humulin, Lantus, Lipitor, Lyrica, Protonix, Tricor, Avandia, Humalog, and Actos. Mr. Hurley last worked as a sheet metal installer and as a plexiglass fabricator.

On April 2, 2009, Peter H. Neale, D.O., Mr. Hurley's treating physician, wrote a letter to the Disability Determination Bureau, indicating that he had been Mr. Hurley's family physician for at least 13 years and that Mr. Hurley has never been free from pain in his lower back. "He has surgeries and epidural steriods and if anything over time has just gotten worse. I believe he is someone who is truly disabled from gainful employment." (AR 265). Dr. Neale noted that Mr. Hurley's back problems are complicated by diabetes and neuropathy as well as obesity. He concluded, "I believe his back concerns and other medical issues make gainful employment for him not feasible." *Id.*

On May 27, 2009, J. Sands, M.D., a state agency reviewing physician, completed a Physical Residual Functional Capacity Assessment based on a primary diagnosis of chronic low back pain and knee pain. He found that Mr. Hurley could lift 20 pounds occasionally and 10 pounds frequently, could stand and/or walk 6 hours in an 8-hour workday, could sit for 6 hours in an 8-hour workday, and had unlimited ability to push or pull. Dr. Sands' explanation for his conclusions was that Mr. Hurley's gait/station, strength, reflexes, and sensation were within normal limits, noting the tingling in the thighs, the range of motion in the bilateral knees, and the inability to perform range of motion in the lower spine and right hip. He opined that Mr. Hurley could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders/ropes/scaffolds. He wrote:

> Careful consideration has been given to the claimant's statements regarding alleged symptoms and their effect on functioning. The claimant's MDI(s) could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence. Specifically, clmt alleges back pain, knee pain, diabetes and half a clavicle. Clmt did not demonstrate any deficit in his gait or station. He did have limited ROM in the spine and hip. There was only mild swelling of the knees. Clmt is partially credible.

(AR 293). Dr. Sands did not give weight to Dr. Neale's medical source statement because he found it not consistent with the medical evidence of record and because the determination of disability is for the commissioner. The ALJ gave Dr. Sands' opinion little weight because of subsequent evidence admitted into the record.

On July 7, 2009, Dr. Neale wrote a letter to the Disability Determination Bureau, stating, "I believe Mr. Hurley would do poorly even being required to stand stationary for two hours per 8 hours workday. Yes, I believe he would need to change positions to relieve his pain every 15 or 20

minutes." (AR 301). The ALJ gave Dr. Neale's April and July 2009 medical source statements little weight as inconsistent with the physical findings of Dr. Bautista's consultative examination.

On July 21, 2009, Richard Wenzler, M.D., a state agency reviewing physician, completed a Physical Residual Functional Capacity Assessment based on a primary diagnosis of chronic back pain and obesity. He found that Mr. Hurley could occasionally lift 10 pounds and frequently lift less than 10 pounds, could stand and/or walk 2 hours in an 8-hour workday, could sit 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull. In explaining how the evidence supports his conclusion, Dr. Wenzler gave a comprehensive listing of Mr. Hurley's prior complaints, surgeries, treatments, medications, activities of daily living, and Dr. Neale's July 7, 2009 medical source statement. Regarding the severity of Mr. Hurley's symptoms, Dr. Wenzler wrote that he gave Mr. Hurley "limited credibility" because his current activities of daily living were disproportionate to the objective medical evidence of record in the file and the medical source statement. In reviewing the medical source statements of record, Dr. Wenzler gave partial weight to Dr. Neale's July 7, 2009 statement, which resulted in Dr. Wenzler reducing the RFC that had been assigned by Dr. Sands. The ALJ gave Dr. Wenzler's opinion great weight because the restrictions were more consistent with the medical evidence.

### B. Plaintiff's Testimony

At the August 26, 2010 hearing, Mr. Hurley testified that he was in "major pain 24 hours a day." (AR 30-31). Standing for more than 30 minutes would cause numbness from his hips through his legs accompanied by a shooting pain. As a result of diabetic neuropathy, he felt tingling and numbness from his hips through his toes. His back pain prevented him from being able to bend over and tie his shoes. He was able to walk only 50 feet before experiencing pain, and pain in his arms

caused him to have problems reaching, handling, and fingering. He could lift a gallon of milk but could not carry it any distance, nor could he repeatedly lift it. He had daily problems balancing. His days mostly consisted of sitting on a recliner, watching television, napping, and taking his medications. He rarely helped wash dishes and was only able to prepare meals in the microwave. He was unable to shop for food or clothing, performed no yard work, had no hobbies, and interacted socially with no one. He was unable to sit through an hour-long television program, as he would have to get up and stretch or lie down in bed. When sitting he had to recline or "stretch out." (AR 36). He could watch a 30-minute television program but would have to move constantly, going from sitting to stretching to reclining. He could only recline for 5 to 10 minutes, after which he would feel pressure on his lower back and would have to sit up or stretch. As a result of his conditions, Mr. Hurley had to give up playing sports as well as all of his hobbies, including boating, hunting, and fishing. His medications caused him to gain weight and to feel tired. He was unable to lose weight through exercise, as the constant pain prevented him from walking, biking, or using a treadmill. Mr. Hurley testified that he could drive but that he could not drive long distances. He attempted working at his brother's factory but could only work for six and one-half hours and spent the rest of the day stretching or resting.

In a June 25, 2009 contact report with a representative from the Administration, Mr. Hurley reported that the pain interrupted his sleep and that he would get "an hour of sleep here and there . . . ." (AR 236). He had to hold onto the wall for balance when climbing the three steps that led to his house, and he was constantly losing his balance. He spent most of his time lying down and had to constantly switch positions. He had begun having trouble going to the bathroom unassisted.

### C. VE Testimony

At the hearing, the ALJ questioned the VE on the availability of jobs to a hypothetical individual who possessed Mr. Hurley's age, education, and experience who could perform sedentary work. The ALJ further limited the hypothetical individual to unskilled work that allowed him to alternate from sitting to standing within every hour for 5 to 10 minutes; that involved occasional climbing of ramps and stairs; that never involved climbing ropes, ladders, or scaffolds; that involved occasional balancing, stooping, crouching, kneeling, or crawling; and that involved frequent use of both upper extremities. The VE stated that the hypothetical individual could perform work as a bench hand solderer, a day phone order taker, or an order clerk.

The ALJ then inquired as to the availability of jobs to the aforementioned hypothetical individual if he could sit for only 30 minutes at a time, had to shift positions while sitting, or would need to stand every 5 minutes but remained on-task; he was able to lift 10 to 15 pounds occasionally; to stand for 5 minutes, to walk a distance of 50 feet; to occasionally use his arms for overhead reaching with frequent use for climbing and physical activities; and was unable to bend. The VE stated that the same jobs would be available to the hypothetical individual if he had these additional limitations. The VE testified that the hypothetical individual would have to remain on-task when standing, sitting, or shifting in his seat otherwise no jobs would be available.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous

legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing

court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [her] conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled,

and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Mr. Hurley seeks reversal and remand of the ALJ's finding of not disabled on the basis that (1) the ALJ erred when she determined that Mr. Hurley retained the RFC to perform sedentary work provided he was given a sit/stand option; (2) the ALJ erred when she failed to address Mr. Hurley's need to lie down in the RFC assessment; (3) the ALJ proffered an insufficient analysis of how Mr. Hurley's obesity combined with his other impairments to cause his alleged limitations in the RFC

assessment; and (4) the ALJ improperly evaluated Mr. Hurley's credibility. The Commissioner responds that the ALJ's credibility and RFC determinations are supported by substantial evidence.

## A. Credibility

Resolution of the arguments assailing the ALJ's credibility determination is a threshold matter, as Mr. Hurley's criticism of the ALJ's RFC determination turns in large part on Mr. Hurley's testimony about his pain and exertional limitations.

In making a disability determination, social security regulations provide that the Commissioner must consider a claimant's statements about his symptoms, such as pain, and how the claimant's symptoms affect his daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. In determining whether statements of pain contribute to a finding of disability, the regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id*.

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* §§ 404.1529(c)(1); 416.929(c)(1).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

As an initial matter, Mr. Hurley argues that, in formulating her credibility determination, the ALJ impermissibly employed the "boilerplate" language identified now in numerous Seventh Circuit Court of Appeals cases. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, an ALJ's use of the boilerplate language does not amount to reversible error if she "otherwise points to information that justifies [her] credibility determination." *Pepper*, 712 F.3d at 367-68. In other

words, the use of the template does not warrant remand when the ALJ gives other reasons, grounded in evidence, to explain her credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). In this case, the ALJ's use of "boilerplate" language alone does not require remand because the ALJ continued with an analysis of the evidence to explain her credibility determination.

Nonetheless, the ALJ's analysis is deficient in following the requirements of SSR 96-7p such that remand is warranted. The ALJ properly engaged in the two-step test, determining first that Mr. Hurley suffers from underlying medically determinable physical impairments that could reasonably be expected to produce his pain and exertional limitations. However, at the second step, in finding that Mr. Hurley's allegations of pain are not supported by the objective medical evidence, the ALJ did not properly consider the factors used to weigh Mr. Hurley's subjective complaints.

First, the ALJ found Mr. Hurley not fully credible because the "objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations" and because the medical findings do not support limitations greater than those set forth in the RFC (AR 14). The ALJ found that Mr. Hurley's complaints of severe back pain were not supported by the October 2004 physical examination and the May 2009 consultative examination. The ALJ noted that at the October 2004 exam, Mr. Hurley had a positive straight leg-raising test on the left, tenderness in the midline of L5-S1, and limited rotation. But she also noted that the record showed that flexion and extension of the lumbar spine was full, that Mr. Hurley had normal strength with 5/5 ankle flexor, quadriceps, and hamstring strength bilaterally, and that he ambulated without assistance. She also noted the diagnosis of lumbar radiculopathy. As for the May 1, 2009 consultative examination, the ALJ wrote that Mr. Hurley was unable to do the range of motion of the *back* test due to *pain in his back and hips* (although the report provides that Mr. Hurley was

unable to do the range of motion tests in the *back and the hips* due to *pain in his back*) and that Mr. Hurley complained of numbness and tingling sensation in both thighs. The ALJ also noted that Mr. Hurley had a normal gait with no limping, normal neurological findings, and muscle tone and strength of 5/5 in both upper and lower extremities. The ALJ concluded that the clinical findings show degenerative disc disease of the lumbar spine at L4-5 and L5-S1 accompanied by bulging of the intervertebral disc.

However, in finding that Mr. Hurley's back pain was not supported by the objective medical evidence, the ALJ did not address the extent to which Mr. Hurley's activities of daily living were affected by his back pain. The Commissioner does not respond to this argument by Plaintiff. Although she summarized Mr. Hurley's testimony that he could sit for 30-minute increments and lies down after sitting for 30 minutes, the ALJ did not note that when Mr. Hurley is sitting he has to change positions frequently. The ALJ did not discuss Mr. Hurley's testimony regarding the activities such as hunting, fishing, and boating that he no longer performs, nor did she discuss his complaints of constant aching and pain in his arms. The ALJ failed to look beyond the presence or absence of objective medical evidence to examine how the pain affected Mr. Hurley's activities of daily living.

The ALJ further errs by discrediting Mr. Hurley based on his activities of daily living without considering favorable aspects of those activities. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (finding the ALJ's recitation of the administrative record to be misleading or inaccurate on several significant points). First, the ALJ says Mr. Hurley "reported no difficulty driving" (AR 15); this is incorrect as Mr. Hurley testified at the hearing that he cannot drive long distances and reported to Dr. Bautista that he "drives short distances only." (AR 284). Next, the ALJ notes that

18

Mr. Hurley "can stand and wash dishes and cook breakfast and lets his dog out." (AR 15). However, the ALJ fails to acknowledge Mr. Hurley's testimony that he does the dishes "once in a great while" and that as to his ability to cook, he testified, "A little bit of breakfast, maybe making oatmeal, stuff like that, turn the microwave on, and that's about it." *Id.* An ALJ must determine not if a claimant can sporadically engage in physical activity but whether he can sustain full-time work. *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004). The ALJ erred by concluding that, because Mr. Hurley could perform some very basic activities of daily living, he did not suffer debilitating pain. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (finding that the ALJ failed to discuss much of the evidence); *Carradine*, 360 F.3d at 756 (holding that the ALJ's decision exhibited deep logical flaws); *Zurawski*, 245 F.3d at 887-88 (finding that the ALJ's decision did not demonstrate whether she considered all of the medical evidence as it related to the claimant's complaint of pain).

The ALJ also seems to discredit Mr. Hurley because he was unable to do range of motion of the hips and back due to lower back pain, commenting that Mr. Hurley's "failure to do the range of motion of the back was purely subjective and totally within his control and does not by itself support a finding of disability." (AR 14). This statement is not supported by any citation to the medical evidence. In contrast, when Dr. Carobene noted limited rotation of the back in 2004, Dr. Carobene reported that Mr. Hurley was cooperative. In 2009, when Dr. Bautista reported that Mr. Hurley could not do range of motion in the back and hips because of back pain, Dr. Bautista made no notation questioning Mr. Hurley's sincerity or indicating that Mr. Hurley did not attempt the movement; rather, Dr. Bautista's notes provide that Mr. Hurley was "unable to do range of motion of the back due to low back pain" and "unable to do range of motion of either hip due to back pain."

(AR 285). If anything, Mr. Hurley's inability to do the range of motion confirms the seriousness of his back pain. The ALJ's conclusion is unsupported and illogical.

The ALJ also discredits Mr. Hurley on the basis that he had surgery but still complains of back pain, as if all back surgery is completely effective in curing back pain. The ALJ wrote: "For example, according to the claimant he had a laminectomy of the back in 2001 but testified that since the surgery, he has continued to have problems with standing, leaning over and that he cannot lift his grandson." (AR 14). The ALJ offers no explanation for why ongoing pain is inconsistent with prior surgery.

The ALJ found that Mr. Hurley's report to Dr. Bautista that he could walk for 20 minutes without a cane, can sit for one hour, and stand for 20 minutes, and lift 20 pounds are consistent with the RFC the ALJ assigned. However, the ALJ did not consider whether Mr. Hurley could sustain that level of activity routinely over the course of an 8-hour work day.

As for Mr. Hurley's knee pain, the ALJ thoroughly reviewed the medical evidence from 2007 and 2008 as well as the consultative examination in 2009. The ALJ then concluded that the evidence fails to show the severity of knee pain alleged by Mr. Hurley because his treating doctor only recommended conservative treatment. However, that opinion changed and ultimately resulted in the surgery in October 2008. The ALJ also looks at the results of the consultative examination, observing that Mr. Hurley had "full range of motion and his strength was 5/5." (AR 15). However, Dr. Bautista's report made no finding of "full range of motion" as to Mr. Hurley's knees, finding instead that he had "bilateral knee flexion 90 degrees. Right knee with pain and tenderness in the anterior knee." (AR 285). The range of motion findings related to his shoulders and wrists. Dr. Bautista did find that Mr. Hurley had "[m]uscle tone and strength 5/5 in both upper and lower

extremities" and had "[g]ood bilateral knee reflexes." (AR 286). The ALJ found that the medical evidence only showed mild changes and mild degenerative joint disease of the knee. The ALJ recognized that Mr. Hurley's pain returned in 2009 after the surgery, but discredits his pain because the surgeon "only" treated him with injections in the months after the surgery when the pain continued.

Next, the ALJ did not properly consider Mr. Hurley's medications given that the regulations require a discussion of the type, dosage, effectiveness, and side effects of any medication. At the hearing, the ALJ read the list of Mr. Hurley's medications, which included Lyrica, a medication taken to alleviate pain caused by neuropathic damage in the arms, hands, fingers, feet, or toes. Mr. Hurley testified that he experienced constant tingling and numbness from his hips down to his toes, a symptom of diabetic neuropathy; yet, the ALJ did not discuss his use of Lyrica. Although the ALJ noted that Mr. Hurley's medications caused weight gain, she failed to recognize his testimony that his medication also made him tired. *See Dross-Stewart v. Astrue*, 872 F. Supp. 2d 780, 798 (N.D. Ind. 2012); *compare Schaaf v. Astrue*, 602 F.3d 869, 876 (7th Cir. 2010) (finding that the ALJ did not err in the analysis of the claimant's medication because there was no indication in the record to support the conclusions the claimant suggested). The ALJ did not consider that Mr. Hurley's testimony that he spent most of his day sitting and often took naps could be credible in light of his testimony that his medications made him feel tired. On remand, the ALJ shall discuss the side effects of Mr. Hurley's medications on his daily activities. *See Dross-Stewart*, 872 F. Supp. 2d at 798; SSR 96-7p; *see also Herron v. Shalala*, 19 F.3d 329, 336 (7th Cir. 1994).

Mr. Hurley criticizes the ALJ's consideration of his obesity in the credibility determination. The Court finds that, although the ALJ throughly assessed whether Mr. Hurley's obesity imposed

additional physical limitations on him, discussed in more detail in Part 3C below, the ALJ did not discuss the effects of obesity on Mr. Hurley's subjective complaints of pain. The ALJ began her discussion of obesity by recognizing that it could aggravate his back and knee pain but then offered no further analysis about the impact on his pain. The ALJ did not consider whether Mr. Hurley's obesity caused him to be in greater pain that he would have been had he not been obese or how the postural limitations he testified to (sitting for no more than 30 minutes and then needing to lie down) were impacted by his obesity. *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (finding that the ALJ erred by not explaining the consideration given to the claimant's obesity); *see also Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005) (holding that the ALJ erred by failing to account for the effects that obesity had on the claimant's ability to sit or stand). The ALJ did not discuss how obesity could have affected Mr. Hurley's back pain, rendering him unable to reach down to pick up his grandson, how it might have aggravated his degenerative joint disease of the knee, causing him to be able to walk less than a non-obese individual with equally severe degenerative joint disease. On remand, the ALJ shall discuss how Mr. Hurley's obesity interacts with his back pain in the context of the credibility determination. *See Barrett,* 355 F.3d at 1068 (finding that, even if the claimant's "arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both").

Finally, the ALJ discredits Mr. Hurley because he worked after his initial surgery in 1999, reasoning, "the claimant worked for many years after his initial back surgery and the medical documentation does not establish deterioration of his spine." (AR 14). The ALJ offers no discussion of his work history, his subsequent fall at work in 2001, the related back surgery, or the nature of

the job he performed after 2001. Mr. Hurley does not claim disability prior to 2001. The Seventh Circuit Court of Appeals has held that "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job." *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998). Mr. Hurley testified that after his fall in 2001 and the resulting back surgery, he was unable to return to the union job he had previously held as a sheet metal worker. Instead, his brother, who owned a plexiglass fabricating plant, hired Mr. Hurley to work a drill press, which required him to stand eight hours at a heating table, bending plexiglass. Mr. Hurley testified that the weight of the plexiglass and leaning over the tables would "completely knock me out." (AR 38). He then testified that he actually worked six and a half hours, and the remainder of the time he spent resting or stretching out. In his opening statement, Mr. Hurley's counsel recounted that Mr. Hurley would lay down in his brother's office. The ALJ discussed none of this. The emphasis the ALJ placed on Mr. Hurley's ability to work after 1999 in light of her failure to discuss the nature of his actual work requires remand.

Although an ALJ's credibility determination need not be flawless, the omissions by the ALJ in this instance, in the aggregate, raise questions about the thoroughness of the credibility determination and whether the ALJ would come to the same conclusion had she fully and properly considered the evidence. *See Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). In this case, the Court cannot uphold the ALJ's credibility determination. On remand, the ALJ shall consider and discuss each of the identified issues in her credibility determination.

### B. Residual Functional Capacity

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a)(1),

416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870.

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* In addition, she "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id.*

In this case, the ALJ found that Mr. Hurley has the residual functional capacity to perform sedentary work with an ability to lift and carry 10 pounds frequently and 10 pounds occasionally, sit for 6 hours, stand/walk for 2 hours provided that he has the option to sit or stand within every hour for 5 or 10 minutes while remaining on task. Mr. Hurley contends that the RFC assessment was flawed because the ALJ determined that Mr. Hurley retained the RFC to perform sedentary work with a sit/stand option, failed to consider Mr. Hurley's need to lie down, and failed to consider the effects of Mr. Hurley's obesity in combination with his other impairments.

*1.      Sedentary work with a sit/stand option*

Mr. Hurley argues that the ALJ failed to explain what evidence supported her conclusion that he was able to perform work that required him to sit for six hours out of eight so long as he was provided with the option to stand for 5 to 10 minutes after sitting for an hour. Mr. Hurley contends that neither the evidence nor Mr. Hurley's own testimony supports this conclusion.

Mr. Hurley argues that the medical evidence does not support the RFC crafted by the ALJ for less than a full range of sedentary work. His treating physician, Dr. Neale wrote a letter in April 2009, opining that Mr. Hurley's back pain precluded all gainful employment. Dr. Sands' May 2009 RFC, which indicated that Mr. Hurley could perform light work, did not contain any sit/stand option. The ALJ gave little weight to both opinions; Mr. Hurley does not contest the weight given by the ALJ to any of the physician's opinions. The ALJ gave great weight to the opinion of consultative examiner Dr. Wenzler, who gave Mr. Hurley an RFC for sedentary work, in part because of Dr. Neale's July 2009 letter, noting that based on that letter, Mr. Hurley "MAY need to readjust his position every 20-30 minutes to relieve pain, and should NOT stand stationary for 2 hours in an 8 hour day." (AR 316).

In his testimony, Mr. Hurley stated that he "could barely sit up half the time," and that he spent his days immobile, either reclining, stretching out, or laying down. (AR 30-31). He testified that he could stay seated for a 30-minute television program but was unable to remain seated for the duration of an hour-long program because he would have to get up and stretch or lie down in bed. He also testified that, after sitting for 5 to 10 minutes, he would have to "stretch and start moving or sit up or move back." (AR 41). However, he did not testify as to how long he would have to make these adjustments before his pain subsided.

Mr. Hurley argues that the ALJ erred in crafting an RFC for sedentary work with additional restrictions, which indicates that the ALJ found that Mr. Hurley could do less than a full range of sedentary work, because the ALJ did not offer any basis in the record for the additional limitation that Mr. Hurley be allowed to stand for 5 to 10 minutes each hour. The ALJ offers no explanation as to why Mr. Hurley only required a standing option of 5 to 10 minutes, as opposed to 15, 20, or 30 minutes or even a sit/stand at-will option. None of the treating, examining, or reviewing physicians indicated what amount of time would fully accommodate Mr. Hurley's pain. Because the ALJ did not explain the basis for the limitation, the Court cannot trace the path of her reasoning. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (finding that the ALJ failed to identify any medical evidence to substantiate her belief that the claimant was able to meet certain physical requirements); *Briscoe*, 425 F.3d 352 (finding that the ALJ did not explain how he arrived at the exertional limitations in the RFC and that no record evidence supported the RFC).

The Commissioner responds that the RFC is largely consistent with the opinion of Dr. Wenzler, whose opinion the ALJ gave great weight, and who opined that Mr. Hurley could sit for six hours in an 8-hour workday. However, Dr. Wenzler did not opine as to whether 5 to 10 minutes per hour of standing would be sufficient to accommodate Mr. Hurley's pain. Although an ALJ is entitled to adopt the opinion of a medical source regarding a claimant's RFC notwithstanding that the RFC determination is an administrative and not a medical decision, the ALJ is also not required to rely on the entire physician's opinion. SSR 96-5p, 1996 WL 374183, at *4-5 (1996). Regardless, the ALJ's RFC determination must be supported by the evidence or testimony of record. On remand, should the ALJ impose the same RFC, she shall explain the evidentiary basis for this exertional limitation.

*2.      Need to lie down*

Mr. Hurley next contends that the ALJ erred when she did not discuss Mr. Hurley's need to lie down or recline despite Mr. Hurley's testimony that his impairments produced these limitations. The RFC assessment must address each limitation and must contain a narrative discussion of why the ALJ accepts or rejects each limitation based on the evidence of record. *See* 96-8p. Mr. Hurley testified that he spends most of his days napping, lying down, or stretching out, that he was unable to sit for longer than 30 minutes before he had to stretch out or lie down, and that he was most comfortable in a reclining position. He testified that when he worked at his brother's plexiglass manufacturing company, he would work only six and one-half hours and spent the remainder of the time resting or stretching out; the attorney stated that Mr. Hurley would go to his brother's office and lie down.

At the outset of her credibility determination, the ALJ noted Mr. Hurley's testimony that he lies down after sitting for 30 minutes. However, the ALJ did not discuss the need to lie down or how Mr. Hurley's impairments that affect his ability to sit also cause him to need to lie down. This issue is closely related to the ALJ's failure to discuss this testimony in the credibility determination. The ALJ did not construct the logical bridge that was required to justify why Mr. Hurley's impairments limited him to work that required a sit/stand option but not an accommodation regarding his need to lie down. *See Clifford*, 227 F.3d 863 at 872. The ALJ failed to comply with the requirements that her RFC assessment take into account all limitations and her decision should therefore be reversed. *See, e.g.*, *Martinez v. Astrue*, 2:09-CV-62, 2009 WL 4611415, at *12 (N.D. Ind. Nov. 30, 2009) (citing *McQuestion v. Astrue*, 629 F. Supp. 2d 887, 898 (E.D. Wis. 2009)). Why, for example,

wouldn't the combination of Mr. Hurley's obesity, degenerative disc disease of the lumbar spine, and diabetes mellitus require him to lie down for large portions of the day?

In response, the Commissioner contends that Mr. Hurley's testimony that he has to get up and stretch or lie down in bed after watching television seated for more than 30 minutes is a limitation largely consistent with the ALJ's finding. Yet, nothing in the ALJ's RFC provides for the option to lie down at will. On remand, the ALJ shall discuss Mr. Hurley's need to lie down in formulating the RFC.

3.      *Obesity*

Separate from his criticism of the ALJ's consideration of his obesity in the credibility determination, Mr. Hurley also argues that the ALJ erred in her consideration of his obesity in formulating the RFC. Under SSR 02-1p the ALJ must specifically address the effect of obesity on a claimant's limitations. *See* SSR 02-1p, 2002 WL 34686281, *1 (Sep. 12, 2002). Obesity may combine with another impairment and increase the functional limitations of that impairment, which is especially true of musculoskeletal, respiratory, and cardiovascular impairments. *Id.* at *3. This is not a case in which the ALJ failed to explicitly discuss a claimant's obesity or consider obesity in the aggregate with other impairments. *See, e.g.*, *Martinez,* 630 F.3d at 698; *Prochaska,* 454 F.3d at 736-37 (recognizing that a failure to discuss a claimant's obesity is harmless error if the ALJ's decision was predicated on medical opinions that discuss claimant's weight).

The ALJ devoted a full paragraph to discussing the effects of Mr. Hurley's obesity, first finding that he suffers from obesity and recognizing it as a condition that could aggravate his back and knee pain. Recognizing Dr. Neale's summary statement that Mr. Hurley was unable to work due to lower back pain, to which the ALJ gave little weight, the ALJ also noted that Mr. Hurley was able

to walk during examinations without observed difficulty. The ALJ concluded that, based on the record there did not appear to be additional complications from Mr. Hurley's obesity. The ALJ noted that Mr. Hurley's diabetes and hypertension were controlled with proper medication and that there was no evidence of end organ damage caused by his hypertension or any other systemic decline caused by his diabetes. Also, the ALJ gave great weight to the opinion of Dr. Wenzler, the consultative reviewer, and Dr. Wenzler took into account Mr. Hurley's obesity. *See Skarbek*, 390 F.3d at 504.

Thus the Court finds that the ALJ only erred in her discussion of obesity in the RFC to the extent that she did not take into account the effects of obesity on Mr. Hurley's back and knee pain, as discussed above in the context of the credibility determination. Mr. Hurley, who is in the best position to identify additional exertional limitations, does not identify any additional limitations, supported either by medical evidence or his testimony, that the ALJ should have incorporated.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of his Motion to Reverse the Decision of the Commissioner of Social Security [DE 15], and **REMANDS** the Commissioner of Social Security's final decision for further proceedings consistent with this Opinion and Order for the period of disability from the alleged onset date of September 1, 2001, through the February 17, 2012.

So ORDERED this 10th day of March, 2014.

s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record